

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*United States District Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

January 12, 2021

**BY ECF**

The Honorable Denise L. Cote
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    *United States v. Zalmund Zirkind*, S8 19 Cr. 463 (DLC)

Dear Judge Cote:

    The Government respectfully submits this letter in advance of the sentencing of defendant Zalmund Zirkind (the "defendant"). The defendant is scheduled to be sentenced on January 15, 2021, at 11:00 a.m. for his offense in this case: namely, conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956. The Government writes in advance of sentencing and in response to the defendant's sentencing submission, dated January 5, 2021.

    As detailed herein, the defendant's criminal conduct was extensive and facilitated narcotics trafficking in the United States and Canada. However, taking into account that this is the defendant's first offense and his family circumstances, the Government respectfully submits that a substantial term of imprisonment, but one below the Stipulated Guidelines Range, would be fair and appropriate in this case.

**A.**     **Background**

    **1.**     **The Offense**

    In 2017, the DEA began investigating a group of narcotics traffickers and money launderers operating in New York City, California, Mexico, Colombia, Hong Kong, Israel, Canada, and elsewhere. This network moved narcotics proceeds throughout the world using, among other techniques, trade-based money laundering ("TBML") and the Black Market Peso Exchange ("BMPE"). TBML involves purchasing consumer goods, such as cellular phones, using narcotics proceeds, and then selling those goods in a third country, where the proceeds are returned to the drug trafficking organization ("DTO"). (Presentence Investigation Report ("PSR") ¶ 13.)

    The BMPE involves DTOs selling bulk United States currency to money-laundering brokers at a discount, who retrieve the bulk cash in the United States and deposit it into shell accounts in the United States while releasing pesos to the DTOs. At the same time, the money-laundering brokers will purchase bulk pesos from individuals in Mexico or elsewhere who wish to

transfer money to the United States while circumventing the banking system. The money-laundering brokers will pay for these pesos by transferring narcotics proceeds from the U.S.-based shell accounts to accounts controlled by the individuals. (*Id.* ¶ 14.)

Using these methods, members of this conspiracy moved hundreds of millions of dollars overseas from the United States, much of which the DEA has been able to track through financial investigations and other methods. Through its investigation of money-laundering brokers, the DEA was able to learn about the sale and transportation of large narcotics shipments, resulting in the seizure of hundreds of kilograms of heroin, cocaine, fentanyl, methamphetamine, and other narcotics. (*Id.* ¶ 15.)

The defendant's role in the conspiracy was to collect or arrange for the collection of bulk cash both in the United States and Canada, and to move that money internationally through wire payments or mirror transactions. In a mirror transaction, an offshore bank account would release money equivalent to the amount retrieved in the United States – including New York City – or Canada (less a commission). Typically, the defendant would receive a contract for a cash pickup from another member of the conspiracy. He would then coordinate the pickup, or conduct the pickup himself, and arrange to transfer the funds to a designated bank account abroad – typically in Asia. At times, the defendant used his own business account to wire the money from Canada to Asia. The defendant would then obtain a fraudulent invoice to paper over the illegal transaction. (*Id.* ¶ 16.)

For example, on December 24, 2018, a co-conspirator who had agreed to cooperate with the Government and was acting at law enforcement's direction (the "CS") coordinated a money laundering transaction with the defendant over an encrypted messaging application. The following is a portion of the communications between the CS and the defendant on December 24, 2018:

| | | |
|---|---|---|
| CS: | | GM you know how much are u sending today? |
| CS: | | ..? |
| Zirkind: | | I'll know shortly |
| CS: | | Pls |
| CS: | | |



| | |
|---|---|
| CS: | Next pu will be inside the car and you will need to count the blocks (and blocks packs) with the driver |
| Zirkind: | Usually comes out of the trunk. So both can stand outside by the trunk and transfer from one bag to the next |
| CS: | No problem is OK with me |
| CS: | You use the way that is more convenient to you. To count the blocks |
| CS: | And be sure the blocks are 10k each |
| CS: | Ty |
| CS: | Any news with the wire? Soon the banks will close |
| Zal: | Can you please make me an invoice for $12,000 US To MCB You've done it last week |
| CS: | I'm driving I will send you in 20 minutes. |
| CS: | If pls can send before the vals closes he will have the invoice soon |
| Zirkind: | I'm on it |
| Zirkind: | The men's at the bank can you please make the invoice for us |

This is just one of many examples of the defendant coordinating with the CS – both before and after he began cooperating with law enforcement – to conduct a money laundering transaction. This conversation occurred in the context of Benzion Zirkind – the defendant's nephew – retrieving cash narcotics proceeds in New York from a courier, and then wiring money consistent with the value of the cash to an account that the defendant controlled. The defendant asked the CS to provide him with a doctored invoice to use to justify the wire transfer to the bank.

In June 2019, following the defendant's brother's conviction and sentence to four years' imprisonment in Canada for a money laundering related offense,[1] the CS and the defendant discussed whether the defendant would be "stopping" his money laundering activities. The defendant responded that he did not think he would continue given the "pain it's causing the family." Notwithstanding this statement, and although the frequency of his communications with the CS decreased after this conversation, the defendant did continue to launder money in the coming months. For example, in March 2020, the defendant asked the CS to retrieve $500,000 in narcotics proceeds from a co-conspirator in Brooklyn and to transport it to Montreal, Canada.[2] On March 18, 2020, the defendant and the CS discussed this request further:

> Zirkind: Gm [Good morning]
>
> CS: Gm I can't accept your proposal is very risky, I'm working on something else to have the money in Mont. But I need time.
>
> Zirkind: How much time?
>
> CS: At least two weeks, also many people are not working due to the pandemic situation. The border to Canada are close today to non essential traffic. D or avi needs to wait a little in sure I will find a way to have it directly there.
>
> Zirkind: I believe they are great opportunities due to the pandemic. China has been closed a while so they are not working. As far as border is concerned I can cross easily. And it's the best time because they will not scrutinize what's in the car.
>
> CS: I can't take any risk to lose more money I will do it in the safe side only
>
> Zirkind: Ok . Talk in 2 weeks

In total, the Government's evidence indicates that the defendant was involved in laundering approximately $4.4 million during the approximately two years during which he participated in the conspiracy. (*Id.*)

---

[1] *See* Michele Mandel, *Drug Money Courier Claimed Cash Was for Jews Fearing Holocaust*, Toronto Sun (May 18, 2019), *available at* https://torontosun.com/news/local-news/mandel-drug-money-courier-claimed-cash-was-for-jews-fearing-holocaust.

[2] The DEA instructed the CS to decline this request.

### 2. The Defendant's Arrest and Bail

The defendant was arrested in the Northern District of New York on July 16, 2020, after he crossed the border from Canada into the United States. He was transferred to this District on August 4, 2020, and released on bail on August 5, 2020. (PSR at 2.)

### 3. The Defendant's Plea and Guidelines Range

On October 15, 2020, the defendant pled guilty to the sole charge against him in the Indictment pursuant to a plea agreement (the "Plea Agreement"). In the Plea Agreement, the parties stipulated that the defendant was responsible for laundering between $3.5 and $9.5 million of funds he knew to be narcotics proceeds, and that he used sophisticated means to do so. (PSR ¶ 5.) The parties further stipulated that the defendant's offense level was 33 and that his criminal history category was I, resulting in a guidelines range of 135 to 168 months' imprisonment (the "Stipulated Guidelines Range"). (*Id.*) The defendant also agreed to forfeit $87,938. (*Id.*)

### 4. The Probation Department's Recommendation

Consistent with the Plea Agreement, the Probation Department calculated the defendant's Sentencing Guidelines range to be 135 to 168 months' imprisonment. (PSR at 26.) The Probation Department recommends a below-Guidelines sentence of 60 months' imprisonment. The Probation Department acknowledged that "the defendant engaged in this scheme for approximately two years . . . result[ing] in a loss amount of over $3 million dollars," and concluded that imprisonment was appropriate to "serve as just punishment and deterrence from future criminal behavior." (PSR at 27-28.) However, taking into account the defendant's personal circumstances, including his daughter's health issues, the Probation Department ultimately recommended a sentence well below the Stipulated Guidelines Range.

### 5. The Defendant's Sentencing Submission

The defendant filed his sentencing submission on January 5, 2021. ("Def. Mem."). In his letter, the defendant requests a sentence of time served, with special conditions to include a period of intermittent confinement in prison. (Def. Mem. at 25.) The defendant's request is based largely on his desire to assist his family in Canada, the stigma he claims to have faced following his arrest, ███████████████████████████████████.

## B. Discussion

For the reasons that follow, the Government respectfully submits that a substantial sentence, but one that is below the Stipulated Guidelines Range, would be fair and appropriate in this case.

### 1. Applicable Law

The Guidelines are no longer mandatory, but they still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). "[A] district court should begin all sentencing proceedings by correctly

calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "'anchor[s]'" the district court's discretion. *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2087 (2013)).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)).

### 2. A Substantial Term of Imprisonment Below the Stipulated Guidelines Range Is Fair and Appropriate in this Case

The defendant's longstanding involvement in a complex international money laundering conspiracy warrants a meaningful sentence of incarceration. The 18 U.S.C. § 3553(a) factors particularly applicable here include: (1) the need for the sentence to reflect the nature of the defendant's conduct and to provide just punishment; (2) the need to protect the public from future crimes of the defendant and to deter the defendant from continuing to commit crimes; and (3) promoting respect for the law prohibiting money laundering and deterring individuals similarly situated to the defendant from committing such crimes. *See* 18 U.S.C. § 3553(a)(2)(A)-(C). Each of these considerations weighs heavily in favor of a substantial term of imprisonment.

***First*, a substantial term of imprisonment is warranted to reflect the nature of the defendant's criminal conduct and to provide just punishment.**

The defendant's conduct in this case was longstanding and extensive. For years, he facilitated the laundering of narcotics proceeds using complex schemes designed to hide the nature of the funds and transferred those proceeds around the globe. Actions like these facilitate the drug trade, and contribute to the devastation it wreaks on the communities where the drugs are sold. The $4.4 million the defendant laundered is consistent with the proceeds from the sale of roughly 80 kilograms of heroin or over 120 kilograms of cocaine – substantial quantities by any measure. Substantial consequences are necessary to adequately reflect the nature of this crime and to ensure sufficient punishment.

***Second*, and relatedly, a substantial term of imprisonment is necessary to protect the public from future crimes by the defendant, and to deter the defendant from committing future crimes.**

The defendant's claim to have already been deterred from further criminal conduct deserves some skepticism. While his arrest and subsequent separation from his family in Canada have no doubt been difficult, the fact remains that the defendant was acutely aware of the risks he assumed by laundering drug proceeds. His own brother was arrested in 2014 – years before the Government began developing proof of the defendant's involvement in money laundering – and was sentenced to four years' imprisonment in connection with his own involvement in laundering

narcotics proceeds. Notwithstanding his arrest, conviction, and considerable sentence, and the defendant's acknowledgement that the situation had caused real pain to the entire extended family, the defendant was not deterred. Against this backdrop, it is difficult to credit the claim that the defendant has been sufficiently deterred already. Instead, the Government submits that a substantial term of imprisonment is necessary to deter the defendant from future crimes and to protect the public.

This is even more evident in light of the possibility that the defendant will return to Canada following his sentence. The Government will not be able to meaningfully supervise the defendant or easily hold him accountable for any future law breaking once he departs the United States. The threat of future prosecution therefore is unlikely to serve as a real deterrent to the defendant going forward – as a result, the only mechanism available to dissuade him from returning to a life of crime and to protect the public from any future crimes he may commit is a substantial term of imprisonment.

***Third***, **a substantial term of imprisonment is needed to promote respect for the law, and to deter individuals similarly situated to the defendant from committing such crimes.**

The type of money laundering in which the defendant was involved requires an extensive network of participants across the globe in order to succeed. Many of those involved may view themselves as immune from detection, whether because of their efforts to cloak their illegal transactions in a veneer of legitimacy or because they are principally located abroad. A substantial term of imprisonment will send a clear signal to others who have followed and may be considering following in the defendant's footsteps that those who participate in complex international money laundering schemes will face serious consequences upon their apprehension.



**C.      Conclusion**

For the reasons set forth above, a sentence of a substantial term of imprisonment, but one that is below the Stipulated Guidelines Range of 135 to 168 months' imprisonment, would be fair and appropriate in this case.

                Respectfully submitted,

                AUDREY STRAUSS
                Acting United States Attorney

By:   _____
       Aline Flodr / Stephanie Lake / Sheb Swett
       Assistant United States Attorneys
       (212) 637-1110 / 1066 / 6522

cc:    Neil Schuster, Esq. (by ECF)
        Johanna Zapp, Esq. (by ECF)